IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Maria do Rosário Veiga, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Docket No. 07 CV 3182 |
| v. | ) |
| | ) JUDGE MARRERO |
| World Meteorological Organisation, | ) |
| Michel Jarraud, | ) |
| Jorge Cortès, | ) APR 2 0 2007 |
| Joachim Muller, and | ) |
| Iwona Rummel-Bulska, | ) U.S. D.C. CASHIERS |
| | ) |
| Defendants. | ) |

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff by her attorneys, Monika Ona Bileris, Esq., complaining of Defendants, alleges:

**PRELIMINARY STATEMENT**

(1) This is an action for compensatory and punitive damages for racketeering, corruption, summary dismissal, intentional infliction of emotional distress, defamation, retaliatory discharge for whistle blowing activities, and other violations of international and domestic law.

**JURISDICTION AND VENUE**

(2) This court has jurisdiction under 28 USC §§1331 and 1350, and under the principles of pendent and ancillary jurisdiction. 28 USC § 1350 provides federal jurisdiction for "any civil action by an alien for a tort only, committed in violation of the laws of nations or a treaty of the United States." Plaintiff's causes of action arise under, among others, the following laws, agreements, resolutions and treaties:
    a.  Customary International Law;
    b.  United Nations Charter, 59 stat. 1031 Bevans 1153 (1945);

    c. Universal Declaration of Human Rights, G.A. Res. 217A(iii), UN doc. A/810 (1948);

    d. International Covenant on Political and Civil Rights, G.A. Res. 2220A (xxi), 21 UN  Doc., GAOR Supp. (N°. 16) at 52, UN Doc. A/6316 (1966);

    e. United Nations Convention Against Corruption, G.A. Res. 58/4 of 31 October 2003, UN Doc. A/56/422;

    f. The European Convention on Human Rights adopted by the Council of Europe on 4 November 1950, and its seven protocols, in particular Articles 3, 6, and 13;

    g. Basic Documents, N°. 1 (Convention, General Regulations, Staff Regulations, Financial Regulations and Agreements) of the World Meteorological Organisation (WMO Doc. N° 15) (2003);

    h. Title 28 USC §1350;

    i. Common law of the United States of America;

    j. Laws of the State of New York, including but not limited to common law principles of wrongful termination, intentional infliction of emotional distress, and respondeat superior;

    k. Laws of the Republic and Canton of Geneva, Switzerland;

    l. Laws of the Swiss Confederation; and

    m. Law of the International Civil Service as set out in the reported jurisprudence of the International Labour Office Administrative Tribunal and the United Nations Administrative Tribunal.

(3)    The United States District Court for the Southern District of New York is the proper venue of this action pursuant to 28 USC §1391.

## PARTIES

(4)    Plaintiff Maria do Rosário Veiga is a female citizen of Portugal and Italy. She was employed by and was a three (3) year veteran of the World Meteorological Organisation, a specialized but separate agency of the United Nations with its headquarters located in Geneva, Switzerland, until her wrongful termination on 3 November 2006. The Plaintiff's primary residence until January 2007 was in Geneva, Switzerland, but she currently resides in Lisbon, Portugal.

(5)    Defendant World Meteorological Organisation (hereinafter WMO) is a body politic headquartered in Geneva, Switzerland, created by treaty in 1947, but it is not a sovereign state, nor an instrumentality of any one sovereign state. It is also a so-called specialized agency of the United Nations, another body politic headquartered in New York, NY.

(6)    Defendant Michel Jarraud, a French national, is current Secretary General of the World Meteorological Organisation. His address is route de la Bassire, CH 1267 Vich/VD, Switzerland.

2

(7)    Defendant Joachim Muller, a German national, is a Director of the World Meteorological Organisation.  His address is: chemin des Chapelles 4, CH-1297 Founex/VD, Switzerland.

(8)    Defendant Jorge Cortès, an American national, is a Director of the World Meteorological Organisation.  His address is: c/o World Meteorological Organization (WMO), 7bis, avenue de la Paix, Case postale No. 2300, CH-1211 Geneva 2, Switzerland.

(9)    Defendant Iwona Rummel-Bulska, a Polish national, is the former Senior Legal Advisor of the WMO.  She is currently employed by the UN Environmental Programme in Nairobi, Kenya.  Her address is:  c/o UNEP, United Nations Avenue, Gigiri, PO Box 30552, 00100 Nairobi, Kenya.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

(10)    Plaintiff was appointed **as WMO Chief, Internal Audit and Investigation Service [C/IAIS]** by Letter of Appointment dated 5 May 2003, starting as of 1 June 2003 – under a two-year fixed-term appointment as a transfer from ITU at grade P.5 step 1.  This appointment was, under Art 21(b) of the WMO Convention, subject to prior approval by WMO President on behalf of the Executive Council (at 55th Session in 5.2003) in accordance with Article 13 of WMO Financial Regulations and with Declaration of Loyalty to WMO.  This was fully in accordance with WMO Staff Rules & Financial Regulations, including Financial Reg. 13.9.  The Plaintiff's appointment as C/IAIS was renewed for a further two-year period on 2 May 2005.

(11)    Prior to Plaintiff's appointment as statutory internal auditor of the WMO, indications of fraud and embezzlement involving significant amounts of WMO funds were discovered in 2000 by the prior internal WMO auditor, but not accurately disclosed and reported to the Executive Council.  In May 2003, an anonymous letter was circulated among many Permanent Representatives of countries to WMO as well as to the local Geneva newspaper, *La Tribune de Genève,* denouncing the alleged widespread corruption and trafficking of influence at WMO in connection with the election of the organization's Secretary-General.  Plaintiff was mandated to carry out the investigation of the fraud following the internal discovery of a mishandled bank check detected by the Chief Accountant of WMO.  The Plaintiff's subsequent investigation revealed a fraud and embezzlement scheme perpetrated against the WMO involving at least $3.5 million, the proceeds of which were apparently used to unduly influence and rig the 2003 WMO election for Secretary General.

(12)    On or about November 7, 2003, the decision to turn this fraud and embezzlement case over to the Swiss Criminal Judicial Authorities was taken.

3

(13)     Prior thereto, it became clear to Plaintiff Veiga, at the end of August 2003, during a meeting in Moscow, involving the informal, WMO "Bureau"[1], that none of the Bureau members present were interested in turning the case over to the Swiss authorities at all. Rather, the evidence brought forward by Plaintiff Veiga in her preliminary investigation[2] report clearly described both the apparent criminal nature and the extent of the fraud involving several senior WMO officials, as well as the Permanent Representatives of some countries to WMO[3].

(14)     Between September and December 2004, the Secretary-General/Defendant Jarraud mandated Plaintiff Veiga to undertake two missions with the Director, Education and Training Department (D/ETR), Mr. Kaliba Konaré, the first in October to Egypt and Kenya, and the second in December to China, in relation to issues connected with the WMO fraud investigation.

(15)     Mr. Kaliba Konaré was one of the staff members Plaintiff Veiga was investigating; as a presumed accomplice of the main fraudster, Mr. Hassan, and a close supporter of Defendant Jarraud. Plaintiff Veiga expressed her concerns for her security to the Defendant Jarraud.

(16)     The Swiss Investigating Judge in charge of the case and the Swiss investigators of the "Corps de police" were of the opinion that Plaintiff Veiga should not travel anywhere at such a critical time of the investigation, given the circumstances, in order to guarantee her physical safety. Her trips were cancelled due to these timely interventions.

(17)     During the second week of January 2005, the WMO internal JDC (Joint Disciplinary Committee) called Plaintiff Veiga to a meeting where she was asked to explain a series of disciplinary cases which she was responsible for triggering through her investigative report of the subject WMO fraud entitled, "Responsibilities of other staff members within WMO Secretariat". Defendant Muller specifically requested a copy of said report on diskette[4] from Plaintiff Veiga, presumably so that he could easily manipulate the report by extracting the parts corresponding to each of the staff members for the purposes of the work of the Joint Disciplinary Committee.

---

[1] This "Bureau" is not a formal, legislatively sanctioned officer – rather, it is an informal body – not established by the Convention or by any other WMO Regulatory or legal instrument. It is composed of individual members, rather like a "club", the authority of which is contested by some member states including the United Kingdom. Its existence is even contested by some member countries. There are no official documents produced by this body, and its meetings are secret. In a context where public money is involved, this raises important issues regarding the adequacy of the internal governance system at WMO.

[2] Plaintiff's Final Investigation Report dated 29 April 2005 which describes the fraud and embezzlement scheme in full may be found at http://tinyurl.com/39bey6 .

[3] In that meeting at least four out of seven members of the Bureau attending the meeting in Moscow late August 2003, were actively involved in one way or the other in the fraud.

[4] Late in January 2005, the Administrative Assistant of Mr. Muller, Mrs. Florence Groscefilley, informed Plaintiff Veiga that she had kept a copy of the report on her C-Drive because Mr. Muller passed it on to her.

(18)    On or about 18 January 2005, Mr. Hong Yan, WMO Deputy Secretary General and Chairman of the JDC, instructed Plaintiff Veiga to respond to the written replies provided by the three staff members to the Secretary-General's allegations of misconduct on the basis of Plaintiff Veiga's Fourth Interim Investigation Report – "Responsibilities of other staff members within WMO Secretariat" within a very short period of time, in such a way that the Committee could tell the Bureau (27-28 January 2005) and the Second Audit Committee (21-22 February 2005) that the cases were resolved. Plaintiff Veiga expressed her concerns in relation to these inappropriate procedures to the Defendant Secretary-General, noting that the investigator should not take part in the disciplinary procedure, and that the deadline was unrealistic. Mr. H. Yan and the Defendant Secretary-General obliged Plaintiff Veiga to do it anyway.

(19)    At this point in time, Plaintiff Veiga insisted on legal support for her audit investigation into the alleged fraud and embezzlement, which was never provided by WMO. Plaintiff Veiga provided more evidence of the involvement of these three staff members as well as others within the organization, to both the Secretary-General and the JDC Members. This evidence linked the defrauded WMO funds to the election campaign for Secretary-General in May 2003 through which the current Secretary-General, Defendant Jarraud, was elected.

**The closing of the investigation by the Secretary-General, Defendant Jarraud**

(20)    During the Second Meeting of the Audit Committee, held during the second half of February 2005, Plaintiff Veiga reported the status of the investigation and the enormous volume of additional work she had to do in connection with the JDC, informing the meeting that the Swiss Investigating Judge had invited Plaintiff Veiga to consult the files of his criminal investigation in order to aid with her own internal audit and investigation. Notwithstanding, the Audit Committee recommended and the Defendant Secretary-General instructed that the WMO internal investigation conducted by Plaintiff Veiga be closed by 31 March 2005.

(21)    Plaintiff Veiga's official reports show clearly that the motivation of the fraud was to misappropriate the funds of the WMO Fellowship Programme, in order to fund and influence the outcome of the election campaign for the Secretary-General in May 2003, which concluded with the election of Defendant Jarraud. Plaintiff Veiga was surprised that the Secretary-General and the Audit Committee suddenly agreed to close the investigation, ostensibly because it "took too long" and without any technical justification or resolution. At this time the JDC had not yet concluded its work, which was certainly not a justification that the investigation should be suddenly closed. The only apparent reason to stop the investigation was the fact that the Secretary-General and others involved realized Plaintiff Veiga was getting too close to the fact that Defendant Jarraud benefited from the use of defrauded funds to influence the outcome of the subject 2003 election.

(22)   In early December 2005 and then again in January 2006, a member of the JDC, D/SPLA Mr. R. DeGuzman, came to Plaintiff Veiga's office and expressed his regret that he did not insist on getting her complete records of her investigation incident to the JDC deliberations.

(23)   Mr. R. DeGuzman revealed WMO management's strategy in requesting that Plaintiff Veiga advise and reply to the three staff member's alleged misconduct, as ordered by Defendant Jarraud, indicating that this was a way for senior WMO officials to avoid taking responsibility for the fraud and embezzlement of WMO funds by the main fraudster, Hassan.

## Intimidation

(24)   As a consequence of the new evidence collected by Plaintiff Veiga from the files of the Swiss Investigating Judge on 24 February 2005, she was responsible for preparing the internal investigation against Defendant Iwona Rummel-Bulska, then-WMO Senior Legal Adviser (SLA).

(25)   During February 2005, Plaintiff Veiga started receiving anonymous telephone calls at her private fixed telephone at home, mainly during the night.  Often the calls were made early in the morning, and more than one call was received each night within intervals of around one hour.

(26)   As the telephone harassment continued through to late September 2005, Plaintiff Veiga changed her telephone number and placed it in a protected, non-public list. Defendant Jarraud obliged Plaintiff Veiga to give him this number.  It was also provided to her assistants Mrs. Chantal Ettori and Mr. Alexander Denis with the express instruction that they should not provide it to anyone.

(27)   On or about 12 April 2005, Defendant Jarraud stated that he had lost his faith in Plaintiff Veiga, because Plaintiff Veiga had disclosed the content of an e-mail involving Defendant Rummel-Bulska, among others, which e-mail dealt with the 2003 elections for  Secretary-General at WMO, in her investigation report without Defendant Jarraud's prior authorization.

(28)   The Defendant Secretary-General Jarraud threatened Plaintiff Veiga, insisting that she delete from her report the references to Ms. Rummel-Bulska and one Mr. Tolba.

(29)   Defendant Jarraud interfered personally in the content of the two last internal investigation reports prepared by the Plaintiff Veiga into the WMO fraud investigation, "Handling WMO Cheques by C/FEL"(the ninth interim report), and the final report released on or around 29 April 2005.

(30)   On or about 2 May 2005 the Defendant Secretary-General Jarraud specifically requested a meeting with Plaintiff Veiga to discuss her final internal audit report on the fraud investigation, inviting Mr. H. Yan, DSG, and Defendant Muller, D/REM as

6

well.  During this meeting, Plaintiff Veiga was forcefully requested by Defendant Jarraud to remove several passages of the draft final report, including all mention of Defendant Rummel-Bulska, the then-senior WMO legal officer, and her apparent involvement with the initial fraud.  Plaintiff Veiga refused to remove any references at all or to change the wording of her released reports.

(31)    On or about 11 and 23 May 2005, Plaintiff Veiga received a threatening "Personal & Confidential" letter from Defendant Rummel-Bulska requesting that "by 25 May 2005 the accusations contained in the Interim Report dated 12 April 2005 be unconditionally withdrawn and formal apologies be communicated to" Defendant Iwona Rummel-Bulska.  Defendant Rummel-Bulska threatened Plaintiff Veiga to take legal action against the Plaintiff, including but not limited to initiating criminal proceedings and civil proceedings in the event the Plaintiff Veiga failed to withdraw the report.  In the absence of any support from the Secretary-General, Plaintiff Veiga contacted the Swiss Investigating Judge about this threat.  Ultimately, Plaintiff Veiga maintained her reports in their original form despite such threats.

**"Group of Sages" appointed to cover up wrongdoings of Defendant Rummel-Bulska**

(32)    During April 2005, Defendant Jarraud appointed a *"Group of Sages"* to review the internal case against Defendant Rummel-Bulska, which group was used to pressure and threaten Plaintiff Veiga to cover-up Defendant Rummel-Bulska and other's misconduct and wrongdoings, as uncovered by Plaintiff Veiga in the 9th Interim Investigation Report dated 12 April 2005.

(33)    The "three Sages" appointed by the Defendant Secretary-General Jarraud were Mr. Hong Yon, Mr. Rodolf DeGuzman[5] and Defendant Joachim Muller.  Plaintiff Veiga had alleged misconduct against Defendant Rummel-Bulska [the WMO's legal officer] for apparently making telephone calls to several senior WMO officials immediately after being advised by the Swiss Investigating Judge that he was about to arrest Mr. Hassan, as well as to the main internal fraudster Mr. Hassan, on the day before he escaped to Egypt in order to avoid arrest.  As a result of such telephone calls, Mr. Hassan fled Geneva and remains a fugitive from justice today.

**Further Intimidation**

(34)    On or about 4 May 2005, Plaintiff Veiga received from Defendant Muller, apparently accidentally, a document classified confidential - "Report on the Presentation Concerning Defendant Iwona Rummel-Bulska" -"The Misplaced Report".  It was clearly not intended to be provided to Plaintiff Veiga.

(35)    When the delivery of this report to Plaintiff Veiga was discovered by Defendants, Defendant Muller verbally attacked Plaintiff Veiga violently, entering her office suddenly without knocking the door, shouting at her and threatening her ("You give

---

[5] One of the "three sages," Mr. DeGuzman, later, in December 2005, took the initiative to address Plaintiff Veiga personally and apologized for having taken part in such an improper internal process.

me that document now!" (pointing his finger), while Plaintiff Veiga was on the phone speaking with her husband who overheard the shouting.

(36)    The misdelivered report contained Defendant Muller's handwritten corrections of the text and was intended to be conveyed to Mrs. D. Khoury, the then-secretary of the JDC. The report indicated that conclusions regarding internal WMO legal officer, Defendant Rummel-Bulska, should be changed as they "*would damage the image and credibility of Ms Rummel-Bulska and the organisation*".

## Intimidation by the Secretary-General

(37)    Defendant Secretary-General Jarraud told Plaintiff Veiga that if she gave back all the copies of the above document and signed for them, the documents would be destroyed as if they had never existed.

(38)    On or about 11 May 2005, the Defendant Secretary-General addressed Plaintiff Veiga a memorandum dated 4 May 2005 ("Facts that happened…") expressing his disappointment that Plaintiff Veiga refused to accept the solution he proposed regarding the destruction of all copies of the misplaced report, as well as her refusal to provide Defendant Jarraud with a written attestation that she would not keep any copies.

(39)    Plaintiff Veiga explained her situation during a conversation with the Swiss Investigating Judge, who expressed to her his amazement that the Defendant Secretary-General did not take Defendant Rummel-Bulska to the Joint Disciplinary Committee and subject her to disciplinary process for her actions concerning the "tip-off" of the main fraudster Hassan, which allowed him to avoid arrest and to become a fugitive from justice, thereby effectively halting the Swiss criminal investigation.

(40)    The internal disciplinary cases against Defendant Rummel-Bulska, as well that of Mr. Chacowry (the Defendant Secretary-General's Chef de Cabinet and Director of External Relations), were not properly treated according to the then-prevailing WMO internal rules and procedures[6].

(41)    On or about 31 May 2005 the Secretary-General addressed to Plaintiff Veiga a Memorandum entitled "Joint Disciplinary process and related issues", causing Plaintiff Veiga to then realize that none of the WMO staff she had investigated, shown to be accomplice to or directly involved in the subject fraud case had ever been disciplined or punished. The fraud involved many other staff members that had already left the WMO at the time of the investigation as well as many Permanent Representatives to WMO, <u>many of whom continue to sit on the WMO Executive Council where they act in their personal capacities and not as country representatives.</u>

---

[6] The Defendant Secretary-General had exceptionally promoted Mr. Chacowry from grade D1 to D2 shortly after taking office as Secretary-General in early 2004, keeping him in service beyond the age of statutory retirement in his post. This was undertaken presumably to reward Mr. Chacowry for his support to Defendant Jarraud during the fraudulent election campaign for Secretary-General in 2003.

(42)    On or about Monday, 13 June 2005, Plaintiff Veiga received in her office a Memorandum from the Defendant Secretary-General Jarraud, "C/IAIS Report dated 12 April 2005" (including a thick set of photocopies of documents supposedly provided to him by Defendant Rummel-Bulska), requesting the following: *"I wish you to review the material provided by SLA* [the WMO then Senior Legal Advisor, Defendant Rummel-Bulska]. *I assume that in view of the evidence provided to you, including the new additional elements, you would wish to remove the corresponding references in your interim report n° 9 dated 12 April 2005 and of your final report dated 29 April 2005. Please let me know of the actions you will take."*

(43)    As a result of a preliminary forensic analysis of these copies of documents provided by Defendant Jarraud, Plaintiff Veiga concluded that the documents had been tampered with and did not reflect the nature of the originals, including details of telephone calls, the number in her telephone directory of Mr. Hassan, and the messages by a Mr. Tolba threatening Plaintiff Veiga.

(44)    The Plaintiff Veiga concluded that the Defendant Secretary-General Jarraud was attempting to cover up for Defendant Rummel-Bulska and in so doing was trying to intimidate Plaintiff Veiga[7] into dropping her continuing investigation into the ultimate use of the WMO funds embezzled by Mr. Hassan which appeared to have been used to wrongly and unduly influence the outcome of the 2003 WMO election for Secretary-General.

---

[7] Defendant Jarraud clearly conducted Defendant Rummel-Bulska's case in violation of WMO Staff Regulations as well as Section 23 of the Convention on Privileges and Immunities, as follows:

- On or about 28 April 2005, Defendant Jarraud submitted Defendant Rummel-Bulska's case to the Joint Disciplinary Committee, yet on 2 May 2005, he contradictorily decided otherwise.
- Defendant Jarraud submitted copies of the report to Defendant Rummel-Bulska despite the fact that she was not subjected to any disciplinary procedures.
- Defendant Jarraud accepted a visit from Mr. Tolba, an outsider to WMO, in defense of Defendant Rummel-Bulska and against Plaintiff Veiga.
- Defendant Jarraud failed to discipline Defendant Rummel-Bulska for having divulged an Investigation Report outside WMO, without the immunity having been waived.
- Defendant Jarraud conducted Defendant Rummel-Bulska's entire case behind Plaintiff Veiga's back without disclosing to her what was occurring.
- Defendant Jarraud never denied Mr. Tolba's statements attacking Plaintiff Veiga.
- Defendant Jarraud never expressed to Plaintiff Veiga that "allegations in that report are unsubstantiated and that he will write this in the summary report he will present to WMO Executive Council next month" and failed to inform her of the content of the report he prepared for the LVII Executive Council.
- Defendant Jarraud pre-judged Plaintiff Veiga in favor of Defendant Rummel-Bulska.
- Defendant Jarraud never provided Plaintiff Veiga with the adequate specialized legal support she required.
- Defendant Jarraud conveyed photocopies of Defendant Rummel-Bulska's documents and material to Plaintiff Veiga rather than originals.
- The Defendant Secretary-General requested Plaintiff Veiga "to remove the corresponding references in your interim report no 9 dated 12 April 2005 and of your final report dated 29 April 2005.

(45)    On or about 15 June 2005, Plaintiff Veiga addressed a memorandum to Defendant Jarraud requesting authorization to consult with the Swiss Investigating Judge given the fact that the records of the telephone calls made by Defendant Rummel-Bulska to Mr. Hassan had been provided to her by the Judge, and that the Judge had informed Plaintiff Veiga that he had requested the immunity of Defendant Rummel-Bulska to be waived so that he could interview her. Defendant Jarraud did not authorize Plaintiff Veiga to consult with the Swiss Judge, and instead falsely accused her of having a personal conflict of interest in the case of Defendant Rummel-Bulska.

(46)    The third WMO Audit Committee Meeting was held on or around 17-18 June 2005. Contrary to previous meetings, Plaintiff Veiga was not allowed to present her report on the ongoing investigation into the embezzlement fraud. The Secretary-General presented the report on the closure of the investigation to the Audit Committee meeting in an "*in camera*" session not attended by Plaintiff Veiga. Plaintiff Veiga was called in to the meeting on or around 18 June in the morning, Saturday, to make two short presentations: the summary of the progress activities report and the Internal Audit strategy and plan for August 2005-July 2006. As soon as she entered the room the Chairman of the Audit Committee (Mr. Gartner the Permanent Representative of Germany to WMO) addressed her to give her the floor to speak and aggressively warned her not to refer to the fraud investigation in her presentations.

(47)    After Plaintiff Veiga's presentations to the WMO Audit Committee Defendant Rummel-Bulska, in the corridor, before leaving WMO that day, addressed Plaintiff Veiga and told her that the Defendant Secretary-General wanted to get rid of both C/IAIS and SLA (Plaintiff Veiga and Defendant Rummel-Bulska). She told Plaintiff Veiga that as far as she could remember it was Mr. Degefu who had asked her to call the main fraudster Mr. Hassan on 9 November 2004, the day Mr. Hassan fled from Geneva to avoid arrest by the Swiss authorities, but she could not prove it. She added that she knew a lot of things and if the Investigation Reports were not changed regarding her person she would start to speak out.

(48)    Contrary to WMO Financial Regulation 13, the report on the fraud and embezzlement investigation to the WMO Executive Council LVII, 20 June through 1 July 2005, was not prepared by Plaintiff Veiga. As far as Plaintiff Veiga is aware, the Secretary-General had prepared a report himself on the fraud investigation and presented it during the "*in camera*" session on 25 June 2005, not attended by Plaintiff Veiga[8]. Plaintiff Veiga was never told about or provided with a copy of the report which was made that day to the WMO Executive Council by Defendant Jarraud.

(49)    Plaintiff Veiga was called to this "*in camera*" meeting at the end to present a summary of her activities report to the Council. As soon as Plaintiff Veiga took her place in the podium to deliver her report, the WMO President warned Plaintiff Veiga that she should not refer to the fraud investigation.

---

[8] On or about 31 October 2006, Ms. Veiga requested the Defendant Secretary-General provide a copy of the minutes of these Council "*in-camera*" meetings. So far he has failed to provide these, causing Plaintiff Veiga to file an internal administrative appeal on or around 8 February 2007.

(50)    Defendant Jarraud neither requested Plaintiff Veiga to make a contribution to his reports to the Audit Committee and to the Executive Council, nor did he discuss the content with her.  In so doing, he violated the WMO Financial Regulation 13, and the independence of the Internal Audit and Investigation Service.

(51)    Plaintiff Veiga has never had access to this report or to the minutes of the "*in camera*" sessions where the investigation reports were presented and discussed by the WMO Executive Council.

(52)    During this Executive Council, the Secretary-General requested the Permanent Representative of Italy to WMO to talk to Plaintiff Veiga in order to convince her to change her investigation reports regarding Defendant Rummel-Bulska.  Plaintiff Veiga heard this person out, and without giving details, tried to explain that it was not just a question of satisfying and meeting the Secretary-General's personal request, but that the problem was of a criminal nature and Plaintiff Veiga did not think it was correct to falsify her investigation reports.

(53)    In September 2005, Plaintiff Veiga suffered her first medical problems due to the behavior of the Defendants, complaining of very low blood pressure; she visited the United Nations Medical Service and was prescribed two or three days sick leave to rest.

(54)    On or about 6 October 2005 Plaintiff Veiga's job description duties and responsibilities were suddenly advertised publicly as being vacant, without the authorization of the Executive Council to separate their independent internal auditor from the service.  This was in violation of WMO Financial Regulation 13.9.

(55)    On or about 21 October 2005, the Friday before a WMO Audit Committee meeting, which started the following Monday, Plaintiff Veiga realized that the preparation of the Audit Committee meeting had been done in such a way as to deliberately leave her outside of the process, that key information had been kept from her, and that she had been deliberately surprised with the last minute requests for documents from her.

(56)    In particular, the summary of consultant Deloitte's report was not prepared by Plaintiff Veiga's unit, contrary to Financial Regulation 13, and contained gross factual errors, and new inaccurate comments by the WMO senior management never before conveyed to Plaintiff Veiga as internal auditor, yet were presented to the WMO Audit Committee meeting.

(57)    On or about 29 October 2005, Plaintiff Veiga fell sick once more as a result of the actions of the Defendants complained of herein, and causing her to seek treatment at a 24-hour emergency service.  The doctor prescribed a week of sick leave for Plaintiff Veiga.

(58)    On or about 30 November 2005, Plaintiff Veiga received an e-mail from WMO, attaching the final report of 4th Audit Committee meeting.

(59)    Plaintiff Veiga was surprised and shocked to read the content of this report. Her recollection of the events and her inside knowledge of the fraud investigation led her to conclude that the report had been manipulated. On 1 December 2005, she addressed an e-mail to Defendant Jarraud requesting a meeting about the 4th WMO Audit Committee Report.

(60)    The Secretary-General advised Plaintiff Veiga of the appointment of a new staff member, Defendant Cortès, on or around 6 January 2006.

(61)    Near the end of January 2006, Plaintiff Veiga again fell seriously ill, and was prescribed medical full leave until 30 January 2006.

(62)    Since his first contact established with the Internal Audit and Investigation Service during the month of January 2006, and before having taken office officially, Defendant Cortès failed to respect the authority of Plaintiff Veiga, then-Chief, Internal Audit and Investigation Service for WMO.

(63)    Defendant Cortès ignored Plaintiff's responsibilities and authority, and addressed his concerns to Mr. Denis, a G6 staff member of Plaintiff Veiga's IAIS unit, requesting restricted audit material and investigation reports to be sent to him through e-mail without the permission of Plaintiff Veiga.

(64)    Plaintiff Veiga's post was abolished without cause or justification on or about 6 October 2005. Neither the Defendant Secretary-General, nor the President of WMO, explained, either formally in writing or informally, the reasons for removing Plaintiff Veiga from service as internal WMO auditor, contrary to the requirements of General Regulation 145 and Financial Regulation 13.9, or for replacing the Internal Audit and Investigation Service (IAIS) by the new so-called "Internal Oversight Office" (IOO). Nor was reason or explanation given to the Plaintiff for the creation of a new position entitled "Chief, Internal Audit" nor for the reassignment of Plaintiff Veiga to this new position without her assent or consultation.

(65)    On or about 6 February 2006, Plaintiff Veiga requested the WMO Assistant Secretary General's office to provide her with the documentation pertinent to the upcoming WMO Audit Committee. The set of documents for the Audit Committee, however, did not include Doc AC-5 INF.2 Financial Regulations dated 31 January 2006. In this document, Defendant Jarraud submitted to the Audit Committee a proposal for changes to Article 13 of WMO Financial Regulations to accommodate the replacement of the Internal Audit and Investigation Service with the Internal Oversight Office, and the Chief Internal Audit and Investigation Service with the Director Internal Oversight. In order to be legally effective under WMO Regulations, these proposed changes required the approval of and adoption by the WMO Congress which will purportedly take place in May 2007. However, such approval and

adoption will not have any retroactive effect. The Director Internal Oversight was illegally appointed on or about 1 February 2006.

(66)    On or about 8 February 2006, Plaintiff Veiga requested that Defendant Jarraud transmit her report on the serious violations of WMO General Regulation 145 and Financial Regulation 13.9, in connection with abolishment of IAIS and replacing it with IOO, to the Audit Committee before its meeting. It was not transmitted.

(67)    In failing to meet Plaintiff Veiga's request, the Defendant Secretary-General Jarraud grossly violated Financial Regulation 13 10 d): "At the request of the Chief of IAIS, any such report shall be submitted to the Executive Council together with the Secretary-General's comments thereon".

(68)    On or about 22 February 2006, the Defendant Secretary-General prepared and submitted two information documents (AC – V/INF. 1 and 2 – Annex 74) to the Audit Committee containing blatant inaccuracies regarding the abolishment of the IAIS, the creation of IOO, and the involuntarily reassignment of the Plaintiff Veiga.

(69)    Plaintiff Veiga was placed on 100% medical sick leave as of 27 February 2006 and returned to work on or about 8 June 2006 at 50% due to the severe intentional infliction of emotional distress to which she was subjected by the Defendants as complained of herein. During this period of Plaintiff Veiga's medical sick leave, Defendant Cortès continued to address to her a substantial number of e-mail messages (more than 40) containing work-related requests, threats and admonitions.

(70)    On or about 28 February 2006, Defendant Cortès indicated to Plaintiff Veiga that the deadline for completion of the Procurement Audit was 2 May 2006, implying that this audit should be carried out between 1 April 2006 and 2 May 2006. Later, Defendant Cortés contracted a consultant, Mr. Pranab, who took at least two and half months to complete this audit.

(71)    On or about 14 March 2006, Defendant Cortès compelled both Mrs. Chantal Ettori and Mr. Alexander Denis to give him Plaintiff Veiga's protected telephone number at home. Shortly thereafter, Plaintiff Veiga started to receive intimidating anonymous telephone calls on her now unlisted new home number again.

(72)    On or about 30 March 2006, Defendant Cortès forced his way into Plaintiff Veiga's locked WMO office N°. 8J75, breaking the office lock, while Plaintiff Veiga was absent on sick leave and without having spoken to her or even attempting to request the keys from her. He then insisted that Plaintiff Veiga should prepare an inventory of the files contained in that office.

(73)    On or about 24 May 2006, Defendant Cortès, by e-mail message copied to the Defendant Secretary-General Jarraud and to the WMO Chief of Personnel, suggested that Mr. Hassan's personal belongings could be co-mingled with Plaintiff Veiga's own personal effects.

(74)    On or about 1 June 2006, Defendant Cortés advised the Plaintiff Veiga of a deadline of 14 June 2006 for completion of her so-called Brazil report, and 30 June for completion of the follow-up of audit recommendations, both wildly unrealistic.

(75)    On or about 8 June 2006, Plaintiff Veiga realized that Defendant Cortés had, during her absence on sick leave, accessed numerous documents in her office, including confidential correspondence.

(76)    On or about 4 September 2006, WMO Chief of Personnel, Ms. Viale, called Plaintiff Veiga for a meeting and tried to convince Plaintiff Veiga to withdraw her internal administrative appeals against the treatment to which she had been subjected, stating that she had heard the WMO internal appeal board's recommendation to the Defendant Secretary-General would be against Plaintiff Veiga.

(77)    On or about 13 September 2006, the WMO internal appeal board (JAB) replied to Plaintiff Veiga's queries about her serious harassment complaints, stating it had summarily dismissed them out of hand.

(78)    On or about 5 October 2005, the Defendant Secretary-General Jarraud set a meeting with Plaintiff Veiga for 12 October 2005 at 9:30 am. During this meeting, the Defendant Secretary-General Jarraud once again attempted to intimidate and harass Plaintiff Veiga, making false allegations against her regarding the abolishment of IAIS and the content of her communications. He also disingenuously encouraged Plaintiff Veiga to look for a negotiated termination outside of formal channels.

(79)    On or about 3 November 2006, the Defendant Secretary-General Jarraud summarily dismissed Plaintiff Veiga, wrongfully and without cause, in direct retaliation for Plaintiff Veiga's investigation into the initial fraud by Mr. Hassan of approximately $3.5 million in WMO funds, and the apparent use of the proceeds of said fraud and embezzlement scheme by senior WMO officials and the Defendants to improperly influence and control the 2003 election of the WMO Secretary-General which resulted in the election of the Defendant Jarraud.

(80)    During December 2006, the WMO secretariat made public the summary dismissal of Plaintiff Veiga through its publication of WMO INFO 72.

(81)    On or about 30 January 2006, Ms. Carine Richards, the WMO spokesperson, during an interview with Fox News stated that Plaintiff Veiga was **_fired for serious misconduct_**. These defamatory statements were previously made to the Associated Press and published in a news story on or about 27 January 2007.

(82)    Plaintiff has suffered pain and humiliation as a result of the foregoing wrongful discharge and the retaliation she has faced. Direct side effects from the harassment and retaliation have included severe weight loss, depression, stomach and digestive problems, which forced her to go on sick leave and to accumulate large medical bills.

## FIRST CAUSE OF ACTION
### Breach of Contract

(83)    Plaintiff Veiga repeats and realleges each and every allegation contained in paragraphs 1 through 82 of this Complaint with the same force and effect as if set forth herein.

(84)    With respect to her employment contract, Plaintiff has performed all the conditions, covenants and promises on her part to be performed, except those which have been excused or made impossible due to Defendants' conduct.

(85)    Defendants' first written notice of Plaintiff's termination was given on 3 November 2006.  In failing to pay Plaintiff the salary, benefits, health insurance, pension fund contributions and other emoluments (including separation grants and indemnities) due to her under her terms of appointment, her employment contract and the rules and regulations of the WMO for the period from 1 September 1997 (the date she joined the United Nations System through to 31 May 2007[9]), the Defendant WMO has breached the Plaintiff's employment contract.

(86)    As a direct and proximate result of Defendants' conduct, Plaintiff has suffered a loss of income, salary and benefits, all in excess of the jurisdictional limits of the U.S. Federal District Court.

(87)    WHEREFORE, the Plaintiff prays judgment against Defendants as more fully set out below.

## SECOND CAUSE OF ACTION
### Wrongful Termination

(88)    Plaintiff Veiga repeats and realleges each and every allegation contained in paragraphs 1 through 87 of this Complaint with the same force and effect as if set forth herein.

(89)    Defendants terminated Plaintiff's employment in bad faith, and without good cause, for the purpose of preventing Plaintiff from conducting her statutorily mandated audit duties, and from investigating and discovering the Defendants' participation in or benefit from the fraud and embezzlement scheme undertaken by Mr. Hassan which resulted in a loss of at least $3.5 million to WMO, the proceeds of which fraud and embezzlement scheme were wrongfully used to influence and rig the outcome of the 2003 WMO election for Secretary General.  Defendants' subsequently stated reason—that the Plaintiff had committed serious misconduct—was false, and the Defendants knew that this reason was false.  Defendants' various stated reasons were

---

[9] Absent a legally valid reason for not reviewing the Plaintiff's contract (such as lack of funds or real misconduct), the jurisprudence of the ILO Administrative Tribunal provides that WMO would be obligated to renew the Plaintiff's two year contract for another two year term upon its expiration on 31 May 2007.

15

pretextual, bad faith reasons, since Plaintiff committed no misconduct whatsoever but instead was simply carrying out her statutory audit functions in an independent and lawful manner.

(90)    Plaintiff was also terminated in retaliation for having discovered, investigated and reported to Swiss judicial officials the Defendants' apparent illegal activities and involvement in the fraud and embezzlement scheme carried out by Mr. Hassan, and as an innocent scapegoat for the illegal activities of others, in gross violation of public policy, as embodied in the federal common law of wrongful discharge, 18 USC §1001, the UN Anti-Corruption Treaty, and the United Nations so-called Whistleblower Protection Policy.

(91)    Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendants' actions, including impairment in her pursuit of her chosen career, lost earnings and benefits, mental, emotional and physical distress including depression, weight loss, humiliation, embarrassment, anguish, anxiety, frequent eczema in her eyes, tension, irritability, fear, sudden decreases of blood pressure and insomnia.

(92)    WHEREFORE, the Plaintiff prays judgment against Defendants as more fully set out below.

### THIRD CAUSE OF ACTION
### Intentional Interference with a Contractual Relationship

(93)    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 92 of this Complaint with the same force and effect as if set forth herein.

(94)    Defendants Jarraud, Cortès, Muller and Rummel-Bulska were aware of Plaintiff's employment by Defendant WMO.

(95)    Upon information and belief, the termination of Plaintiff's employment with Defendant WMO was at the request of, and through the instigation of Defendants Jarraud, Cortès, Muller and Rummel-Bulska.

(96)    By acting to cause the termination of Plaintiff's employment with Defendant WMO, Defendants Jarraud, Cortès, Muller and Rummel-Bulska intentionally and maliciously interfered with Plaintiff's employment with Defendant WMO.

(97)    By acting to cause Plaintiff's termination, Defendants Jarraud, Cortès, Muller and Rummel-Bulska acted willfully and maliciously because of personal motives, to wit, to avoid the public discovery and disclosure of their participation in and benefit from the fraud and embezzlement scheme against WMO and ascribed to Mr. Hassan, and thus acted in the individual capacities and outside their respective capacities as employees of Defendant WMO.

(98)    Plaintiff Veiga would not have been discharged but for the intentional and malicious interference with her employment relationship with Defendant WMO by Defendants Jarraud, Cortès, Muller and Rummel-Bulska.

(99)    As a direct and proximate result of the intentional interference with the Plaintiff's employment by Defendants Jarraud, Cortès, Muller and Rummel-Bulska, Plaintiff has suffered loss of back and future salary and benefits, damage to her reputation, and the loss of future earning potential.

(100)   WHEREFORE, the Plaintiff prays judgment against Defendants Jarraud, Cortès, Muller and Rummel-Bulska, jointly and severally, in their individual capacities as more fully set out below.

## FOURTH CAUSE OF ACTION
### Breach of Covenant of Good Faith and Fair Dealing

(101)   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 though 100 of this Complaint with the same force and effect as if set forth herein.

(102)   Plaintiff's employment agreement contained an implied-in-law covenant of good faith and fair dealing that neither party would do anything to injure the right of the other party to enjoy the benefits of such contract.

(103)   In terminating the Plaintiff's employment in bad faith, without good cause, upon a pretext, in violation of public policy, all for the purpose of frustrating Plaintiff Veiga's discovery and investigation of the Defendants' participation in and/or benefit from the $3.5 million fraud and embezzlement scheme against WMO and ascribed to Mr. Hassan, Defendants breached this covenant of good faith and fair dealing.

(104)   As a direct and proximate result of Defendants' conduct, Plaintiff has suffered a loss of income and benefits in an amount in excess of the jurisdictional limits of this Court.

(105)   In doing the things herein alleged, the Defendants' conduct was despicable, and Defendants acted toward Plaintiff with malice, oppression, fraud, and with a willful and conscious disregard of Plaintiff's rights entitling Plaintiff to an award of punitive damages.

(106)   WHEREFORE, the Plaintiff prays judgment against Defendants as more fully set out below.

## FIFTH CAUSE OF ACTION
### Outrageous Conduct—Intentional Infliction of Emotional Distress

(107)   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 though 106 of this Complaint with the same force and effect as if set forth herein.

17

(108)    Defendants, in their official capacities, and individually, constantly harassed and threatened the Plaintiff in order to frustrate her internal audit duties and to derail her fraud investigation, caused or abated the Plaintiff's receipt of crank and threatening telephone calls in the early morning hours, broke into the Plaintiff's locked office and rifled through her official files, caused external lawyers to threaten the Plaintiff with criminal and civil actions if she continued to pursue her statutory audit duties at WMO and/or continued her investigation into the $3.5 million fraud and embezzlement scheme against WMO and ascribed to Mr. Hassan, constructively terminated the Plaintiff's appointment by abolishing her post and functions without reason or consultation, defamed the Plaintiff publicly, both inside and outside the WMO, and ultimately summarily dismissed the Plaintiff from the WMO without cause, in bad faith, on false grounds, against public policy, in retaliation for performing her statutory audit duties.

(109)    The conduct of the Defendants and their agents, servants and employees was so extreme, outrageous, atrocious and shocking as to exceed all bounds of decency, is utterly intolerable in civil society, and was the direct and proximate cause of the damages suffered by the Plaintiff herein.

(110)    As a result of Defendants' conduct, Plaintiff has suffered damages, and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, loss of reputation, and loss of enjoyment of life; was prevented and will continue to be prevented from performing her daily activities and obtaining the full enjoyment of life; has sustained loss of earnings and earning capacity, which she continue into the future, has lost substantial benefits and retirement income; has lost significant advantageous tax treatment; has lost substantial health and life insurance benefits; has been impaired in her ability to obtain a similar position within an international organisation; has been forced to move her domicile back to her country of origin on short notice and to remain physically separated from her husband (who lives and works some 2000 kilometers away from the Plaintiff's new residence), without financial support from WMO; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

(111)    WHEREFORE, the Plaintiff prays judgment against Defendants as more fully set out below.

## SIXTH CAUSE OF ACTION
### Defamation

(112)    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 though 111 of this Complaint with the same force and effect as if set forth herein.

(113)    After Plaintiff's unlawful termination in December 2006, the Defendants caused to be published through its internal bulletin, WMO INFO N° 72, in French and English,

which is read and distributed widely inside and outside WMO, notice of Plaintiff's summary dismissal. Additionally, through WMO's official spokesperson acting within the scope of her employment, the Defendants gave a statement to the Associated Press, which statement appeared on its website and was republished in more than 140 media outlets and newspapers worldwide, asserting that the Plaintiff had been terminated on account of serious misconduct. The said WMO spokesperson, again acting in her official capacity, repeated this statement during an on-camera interview given to Fox News which was broadcast world-wide on 31 January 2007 on the Fox News prime-time news program called "Special Report with Brit Hume". During this interview, the said WMO spokesperson also stated that the Plaintiff's summary dismissal had nothing to do with her investigation in the fraud and embezzlement scheme ascribed to Mr. Hassan.

(114)  The Defendants, through their agents, servants and employees, with malice, did publish the aforementioned statements as to the circumstances of the Plaintiff's termination which were false.

(115)  The foregoing constitutes libel and/or slander, and has adversely affected the Plaintiff's ability to earn a living.

(116)  As a result of the aforementioned publications, the Plaintiff has been damaged generally and specially, has been hindered in obtaining other employment, has been subjected to ridicule and ostracism, including within her profession, and has suffered damage to her reputation in the community and specifically with former co-workers by the actions of the Defendants herein.

(117)  Because of said willful and malicious publication by Defendants or on their behalf, Plaintiff is entitled to recover actual, compensatory, consequential and punitive damages against Defendants.

(118)  WHEREFORE, the Plaintiff prays judgment against Defendants as more fully set out below.

## SEVENTH CAUSE OF ACTION
### Racketeering Influenced Corrupt Organisation Act (Civil RICO)

(119)  Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 though 118 of this Complaint with the same force and effect as if set forth herein.

(120)  Defendants Jarraud, Cortès, Muller and Rummel-Bulska are each persons under 18 USC § 1961(3).

(121)  The relationship between Defendants Jarraud, Cortès, Muller and Rummel-Bulska (hereinafter the "Enterprise") constitutes an association in fact enterprise under 18 USC §1961(4) and the persons controlling or directing the affairs of the Enterprise

have engaged in activities or a pattern or practice of conspiracy and racketeering activity in violation of 18 USC §1962 *et seq.*

(122) The Enterprise had an on-going business aside and apart from the racketeering acts alleged herein as the persons controlling or directing the affairs of the Enterprise were also involved in the legitimate management of the World Meteorological Organisation.

(123) The Defendants Jarraud, Cortès, Muller and Rummel-Bulska maintained and exercised control over the Enterprise alleged.

(124) The Defendants Jarraud, Cortès, Muller and Rummel-Bulska and others associated with or employed by those persons controlled or directed the affairs of the Enterprise and engaged in activities which affected interstate or foreign commerce.

(125) Since at least approximately 2003 through the present date, the Defendants Jarraud, Cortès, Muller and Rummel-Bulska, aided and abetted by each other, their agents, employees and other persons controlling or directing the affairs of the Enterprise engaged and/or associated themselves with the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §1962, as herein described, to intentionally, recklessly and/or negligently conceal criminal conduct of its agents, to aid and abet the concealment of criminal conduct, to obstruct justice, to obstruct criminal investigations, to evade criminal and/or civil prosecution and liability, to engage in mail and/or wire fraud, to commit bank fraud, to launder money from an illicit fraud and embezzlement scheme committed against the World Meteorological Organisation, to bribe, corrupt or otherwise unduly influence public officials in their official functions, to commit fraud or to fraudulently induce the member states of the World Meteorological Organisation in furtherance of its scheme to protect corrupt officials of the World Meteorological Organisation and related organizations, to maintain or increase public or state contributions to the World Meteorological Organisation, and/or to avoid public scandal within the World Meteorological Organisation. The foregoing specific acts included racketeering and conspiracy, and were of an ongoing nature continuing into the future.

(126) In the furtherance of their racketeering activities, and in order to hide same, the Defendants caused the Plaintiff to be summarily dismissed and terminated from her employment at WMO. Plaintiff was injured in her business and/or property by reason, as described herein, of the above violation of 18 U.S.C. §1962(c).

(127) WHEREFORE, the Plaintiff prays judgment against Defendants as more fully set out below.

## EIGHTH CAUSE OF ACTION
### Racketeering Influenced Corrupt Organisation Act (Civil RICO)--Conspiracy

(128)  Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 though 127 of this Complaint with the same force and effect as if set forth herein.

(129)  Defendants Jarraud, Cortès, Muller and Rummel-Bulska are each persons under 18 USC § 1961(3).

(130)  The relationship between the Enterprise constitutes an association in fact enterprise under 18 USC §1961(4) and the persons controlling or directing the affairs of the Enterprise have engaged in activities or a pattern or practice of conspiracy and racketeering activity in violation of 18 USC §1962 *et seq.*

(131)  The Enterprise had an on-going business aside and apart from the racketeering acts alleged herein as the Defendants Jarraud, Cortès, Muller and Rummel-Bulska and others were involved in the legitimate management of the World Meteorological Organisation.

(132)  The Defendants Jarraud, Cortès, Muller and Rummel-Bulska maintained and exercised control over the Enterprise alleged.

(133)  The Defendants Jarraud, Cortès, Muller and Rummel-Bulska and others associated with or employed by those persons controlled or directed the affairs of the Enterprise and engaged in activities which affected interstate or foreign commerce.

(134)  The persons controlling or directing the affairs of the Enterprise agreed to enter into a conspiracy to violate the provisions of 18 U.S.C. §1962(c) as described herein and above. As evidence of this agreement, the persons controlling or directing the affairs of the Enterprise and other co-conspirators committed the acts described herein and conspired to conceal the criminal activity of Defendants Jarraud, Cortès, Muller and Rummel-Bulska. As further evidence of this agreement, the persons controlling or directing the affairs of the Enterprise and other co-conspirators conspired with Defendants Jarraud, Cortès, Muller and Rummel-Bulska and others to evade and/or aided and abetted Defendants Jarraud, Cortès, Muller and Rummel-Bulska and others in evading criminal prosecution and the public embarrassment and liability related thereto.

(135)  The above secret agreement or agreements were fraudulently concealed from the Plaintiff, the public, and officials of World Meteorological Organisations' member states.

(136)  In the furtherance of their racketeering activities, and in order to hide same, the Defendants conspired to cause the Plaintiff to be summarily dismissed and terminated from her employment at WMO. Plaintiff was injured in her business and/or property by reason, as described herein, of the above violation of 18 U.S.C. §1962(d).

(137)    WHEREFORE, the Plaintiff prays judgment against Defendants as more fully set out below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment:

(a)    That the court award compensation for Plaintiff Veiga for lost past and future earnings, including without limitation restoration of pension benefits;

(b)    That the court award Plaintiff compensation for loss of fringe benefits and other emoluments;

(c)    That the court award Plaintiff compensatory damages for breach of contract, and the intentional tortious acts of the Defendants, and against the Defendants Jarraud, Cortès, Muller and Rummel-Bulska, in their individual capacities, jointly and severally for the injuries caused to Plaintiff by their racketeering and conspiracy activities prohibited by 28 U.S.C. §1962 *et seq.*;

(d)    That the court award Plaintiff consequential damages for the intentional tortious acts of the Defendants;

(e)    That the court award Plaintiff consequential damages for the intentional tortious acts of the Defendants as a result of their intentional and malicious interference with the Plaintiff's employment at WMO, said award to made jointly and severally against the Defendants Jarraud, Cortès, Muller and Rummel-Bulska, in their individual capacities;

(f)    That the court award Plaintiff compensatory damages for pain, suffering, emotional distress, psychological harm, humiliation and other injuries suffered as a result of the tortious acts of the Defendants;

(g)    That the court award Plaintiff punitive and exemplary damages for injuries suffered as a result of the tortious acts of the Defendants;

(h)    That the court direct Defendants to place Plaintiff in the position she would have occupied but for the Defendants' illegal and retaliatory treatment of her, and make her whole for all earnings she would have received but for Defendants' illegal and retaliatory treatment, including, but not limited to, wages, pension, and any and all other lost benefits;

(i)    To award Plaintiff compensatory and punitive damages for injuries suffered as a result of violations of law as alleged herein in an amount considered fair by the jury but not more than USD$ 15 million;

(j)    To treble the damages awarded to the Plaintiff herein pursuant to 28 U.S.C. §1962 *et seq.*;

(k)  That the Court award Plaintiff the costs of this action together with reasonable attorneys' fees, as provided for in 18 U.S.C. §1962 *et seq.*;

(l)  For interest at the maximum legal rate on all sums awarded; and

(m)  To grant such other and further relief as this Court deems necessary and proper.

Respectfully submitted,

Monika Ona Bileris, Esq. [MB1121]
212 West 104 Street, 4D
New York, New York 10025
Tel. 917-826-4588

Edward Patrick Flaherty, Esq.[10]
Schwab, Flaherty, Hassberger, Crausaz & Associes
Case postale 510
CH-1211 Geneva 17, Switzerland
Tel. 4122 840 5000
Fax 4122 840 5055
*flaherty@sfhc.ch*

Dated: New York, New York
        20 April 2007

---

[10] A member in good standing of the bars of the US Supreme Court, the Supreme Judicial Court of Massachusetts, and the Federal District Court for the District of Massachusetts. A motion to allow Mr. Flaherty's appearance before the Court *pro hac vice* will shortly be made.

24

Certification of Service

  Monika O. Bileris, one of the attorney for Plaintiff Maria do Rosário Veiga,

hereby certifies:  I have today served the foregoing Summons and Complaint on the defendants

by certified mail.

  Dated:  April 20, 2007

_____

Monika O. Bileris [MB1121]
