USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7-15-08

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ X
MARIA DO ROSÁRIO VEIGA,              :
                                     :
                   Plaintiff,        :
                                     :   07 Civ. 3182(VM)
                                     :
       - against -                   :
                                     :   DECISION AND ORDER
WORLD METEOROLOGICAL ORGANIZATION    :
et al.,                              :
                   Defendants.       :
-------------------------------------X
```

**VICTOR MARRERO**, United States District Judge.

## I. BACKGROUND

Plaintiff Maria Do Rosário Veiga ("Veiga"), a citizen of Portugal and Italy, brought this action naming as defendants her former employer, the World Meteorological Organization ("WMO"), an international organization headquartered in Geneva, Switzerland, as well as Michel Jarraud ("Jarraud"), a French national who is a Secretary General of the WMO and a resident of Switzerland; Joachim Muller ("Muller"), a German national who is a Director of the WMO and a resident of Switzerland; Jorge Cortès ("Cortès"), an American national who is a Director of the WMO and a resident of Switzerland; and Iwona Rummel-Bulska ("Rummel-Bulska"), a Polish national who is a former legal advisor of the WMO and now a resident of Nairobi, Kenya (collectively "Defendants").

Because on its face the complaint indicates that all material events and operative facts that gave rise to the

action occurred at the WMO in Geneva, that the parties, witnesses, and documents associated with the case are situated primarily in Switzerland, and that Veiga's substantive claims for relief are grounded on various instruments of international law, as well as local and federal law of Switzerland and the United States, the Court, by Decision and Order dated May 7, 2007, dismissed the case under the doctrine of forum non conveniens. However, as conditions of dismissal, the Court allowed Veiga to apply for the imposition of requirements that, in the event Veiga were to commence litigation of her claims in Switzerland, Defendants would accept service of process and personal jurisdiction, not raise defenses based on the statute of limitations and pay any final judgment rendered against them.[1] Veiga responded by letter urging the Court to grant reconsideration. By Memo-endorsed Order dated April 3, 2008, the Court authorized Veiga to serve a copy of the summons, complaint and motion for reconsideration on the WMO by personal and mail delivery to the WMO representative in New York, insofar as such service would not be inconsistent with any provision of international treaty or national law.

Invoking applicable privileges and immunities under

---

[1] The Court's Decision and Order is reported as <u>Veiga v. World Meteorological Organization</u>, 486 F. Supp. 2d 297 (S.D.N.Y. 2007).

treaties and international and United States law, the WMO, in a submission to the Court dated April 30, 2008 (the "WMO's Resp."), declined to accept service. The Court then granted Veiga's request that the WMO's response be treated as a motion to dismiss this action for lack of subject matter jurisdiction. By letter to the Court dated June 9, 2008 ("Veiga's Resp."), Veiga opposed the motion. Having considered the correspondence and related documents described above, as well other documents filed in connection with this litigation, and having reviewed relevant legal authorities, the Court grants the WMO's motion.

## II. DISCUSSION

The facts pertaining to this case are described in the Court's earlier ruling dismissing the action on forum non convenience grounds, familiarity with which is assumed. See Veiga, 486 F. Supp. 2d at 300-03.

In support of its claim of immunity from process in this action, WMO relies, among other authorities and precedents, on: (1) the privileges and immunities provision contained in Article 27 of the Convention of the World Meteorological Organization, adopted in 1947 and ratified by the United States on May 4, 1949, 1 U.S.T. 281; (2) the Convention on the Privileges and Immunities of Specialized Agencies of the United Nations, adopted in 1947, which provides for immunity

from legal process for the specialized agencies of the United Nations, an institutional status the WMO acquired in 1951, see G.A. Res. 179(II), U.N. Doc. A/RES/179(II) (Nov. 21, 1947); (3) the International Organizations Immunities Act ("IOIA"), 22 U.S.C. § 288 et seq.; (4) Executive Order No. 10676 of September 1, 1956, by which the President of the United States designated the WMO as an international organization entitled to the privileges and immunities conferred by the IOIA, see 21 Fed. Reg. 6625 (1956); and (5) the Headquarters Agreement between Switzerland and the WMO, which specifies the legal status granted to the WMO by Switzerland as Host State of the WMO, see Agreement, Plan of Execution, and Protocol Concluded Between the Swiss Federal Council and the World Meteorological Organization, March 10, 1955, at 189, http://www.wmo.int/pages/governance/policy/documents/WMO_15_07_en.pdf (last visited July 14, 2008). The WMO also points out that Article 21(b) of its Convention designated the Administrative Tribunal of the International Labour Organization as the sole forum for the resolution of disputes between the WMO and its employees, and that Veiga had availed herself of this mechanism in filing numerous complaints asserting essentially the same allegations and claims contained in her action before this Court.

Confronted with the compelling weight and barriers

created by these authorities, Veiga, in a striking display of professional candor, acknowledges the forceful legal impediment she cannot readily overcome. In particular, she states that she "can only lament the fact that the current state of U.S. law, as applied by most American courts faced with an action against an international organization such as the WMO purporting to enjoy immunity from suit or process, supports the assertion of [the WMO]." (Veiga's Resp. 3.) Indeed, § 228b of the IOIA explicitly provides that specified international organizations "shall enjoy the same immunity from suit and every form of judicial process as is enjoyed by foreign governments," except to the extent expressly waived. 22 U.S.C. § 228b. Section 288d extends that immunity to acts performed by officers and employees of international organizations in their official capacity and falling within their jurisdictions. See id. at § 288d(b). As the WMO's response to this action confirms, there has been no express waiver of immunity by the WMO on its behalf or that of the WMO officers or employees named as individual defendants.

Case law applying the IOIA uniformly holds that international organizations covered by the statute, while engaged in noncommercial activities, are immune from process in suits brought by their employees alleging breach of contract, wrongful termination, fraudulent conduct and other

claims similar to those asserted by Veiga in the instant action. See Mendaro v. World Bank, 717 F.2d 610, 615 (D.C. Cir. 1983) (noting that "one of the most important protections granted to international organizations is immunity from suits by employees of the organization in actions arising out of the employment relationship"); Tuck v. Pan Am. Health Org., 668 F.2d 547, 549-50 (D.C. Cir. 1981); Broadbent v. Organization of Am. States, 628 F.2d 27, 35 (D.C. Cir. 1980); Brzak v. United Nations, No. 06 Civ. 3432, 2008 WL 189973, at *4 (S.D.N.Y. Apr. 29, 2008); De Luca v. United Nations Org., 841 F. Supp. 531, 534-35 (S.D.N.Y. 1994). This country's recognition of this doctrine and the practical and diplomatic grounds supporting it were articulated by the District of Columbia Circuit in Broadbent:

> The United States has accepted without qualification the principles that international organizations must be free to perform their functions and that no member state may take action to hinder the organization. The unique nature of international civil service is relevant. International officials should be as free as possible, within the mandate granted by the member states, to perform their duties free from the peculiarities of national politics.

628 F.2d at 35.

Veiga nonetheless seeks to avoid the inevitable conclusion of her concession by the novel approach of challenging the constitutionality of the IOIA. She contends that accepting the WMO's claimed immunity from process

pursuant to the IOIA in this case would deprive her of all rights of action, remedies and access to an American court without any substitute legal recourse, thus denying her justice in violation of fundamental rights she asserts under the United States Constitution. Specifically, Veiga claims that dismissal of her suit by reason of Defendants' immunity would (1) deny her right of due process under the Fifth and Fourteenth Amendments by barring access to the Court for a hearing on the merits of her complaint; (2) abridge her First Amendment right of free speech to petition the government for redress of grievances; and (3) deprive her of a right to trial by jury in violation of the Seventh Amendment. Veiga further contends that application of the IOIA in this case would violate the International Covenant on Civil and Political Rights, 999 UNTS 171, 6ILM 368 (1966), by failing to provide her with a remedy for the human rights claims she asserts.

Veiga's challenge rests upon a predicate for which she fails to offer any legal explanation or warrant other than conclusory arguments: that she has constitutional rights to invoke in this case or standing to challenge the validity of the IOIA. As a starting point for an analysis of this premise, the Court notes that, absent very limited exceptions, the United States Constitution does not apply to events that occur in other sovereign nations not involving American

citizens or effects in the United States. See United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 318 (1936) ("Neither the Constitution nor the laws passed in pursuance of it have any force in foreign territory unless in respect of our own citizens."); Restatement (Third) of the Foreign Relations Law of the United States, § 402 cmt. d (1987) (discussing the "effects" principle). In this connection, the Court notes that Veiga states that she is a resident of Portugal and Italy. She points to no personal contacts with the United States. The WMO is an international organization headquartered in Switzerland and its operations are subject to a Headquarters Agreement with Switzerland. At all relevant times, the individual Defendants were residents of Switzerland. All of the pertinent acts and events that gave rise to Veiga's claims happened in Switzerland and are governed by Swiss law and applicable international agreements.

The factual background summarized above fails to demonstrate any relevant conduct or material effect from the underlying circumstances that occurred in the United States, or any other matter that touches substantially upon an essential interest of the United States sufficient to give rise to the application of any provision of the United States Constitution. The inquiry thus raises threshold questions as to whether the constitutional protections Veiga claims are

available to her before this Court, in other words, whether there is sufficient ground for extraterritorial application of United States law to the circumstances of Veiga's claims. See, e.g., Restatement (Third) of the Foreign Relations Law of the United States, § 402 (1987); Bersch v. Drexel Firestone, Inc., 519 F.2d 974, 984-93, cert. denied, 423 U.S. 1018 (1975); In re Alstom Sec. Litig., 406 F. Supp. 2d 346, 366-67 (S.D.N.Y. 2005).

Veiga's constitutional argument raises two closely-related questions: 1) whether the United States Constitution affords rights and protections to nonresident aliens located abroad; and 2) whether a nonresident alien has standing to invoke the subject matter jurisdiction of the federal courts, i.e., the power to demand access to American courts.

A.  THE CONSTITUTION'S EXTRATERRITORIAL LIMITS

Disputes over the Constitution's extraterritorial application generally involve finding a boundary line through the gray areas between citizen and alien, as well as between foreign soil and United States territorial boundaries. As this demarcation implicates an evolving area of the law, some historical background is necessary to determine where in this spectrum Veiga's claim falls. As a starting point in these issues of nationality and territoriality, the Court notes that at issue here is the extraterritorial reach of the

Constitution's protections to any person who would invoke them, not the extraterritorial limits of the federal government's sovereign power. The legislative authority of the federal government may extend to conduct by American citizens abroad, provided the sovereign rights of other nations or their nationals are not infringed. See Lauritzen v. Larsen, 345 U.S. 571, 587 (1953); United States v. Mitchell, 553 F.2d 996, 1001 (5th Cir. 1977). Citizenship alone is generally recognized as a relationship sufficient to grant extraterritorial jurisdiction under international law principles. See the Restatement (Second) of the Foreign Relations Law of the United States, § 30 (1965).

Aliens enjoy a range of constitutional protections once they have come within the territorial boundaries of the United States, and have established connections with this country. See generally United States v. Verdugo-Urquidez, 494 U.S. 259, 270-71 (1990); see also Plyler v. Doe, 457 U.S. 202, 211-12 (1982) (holding that illegal aliens are protected by Fourteenth Amendment's Equal Protection Clause); Matthews v. Diaz, 426 U.S. 67, 77 (1976) (finding that the Fifth and Fourteenth Amendments protect even illegal or involuntary aliens within the jurisdiction of the United States from deprivation of life, liberty, or property without due process of law); Bridges v. Wixon, 326 U.S. 135, 148 (1945) (holding

that resident aliens have First Amendment rights).

However, Supreme Court precedent has established that outside the sovereign territory of the United States, the Constitution's protections do not apply with the same force and effect. See Verdugo-Urquidez, 494 U.S. at 268-70. In a series of cases known as the Insular Cases, the Supreme Court addressed whether the full range of constitutional guarantees applies to persons in United States territories not yet admitted as States. See generally Boumediene v. Bush, 128 S. Ct. 2229, 2254-55 (2008) (summarizing the cases). What emerged from this jurisprudence was the doctrine of territorial incorporation, under which the Constitution fully applies to incorporated territories destined for statehood, but is limited in its application to unincorporated territories. See, e.g., Dorr v. United States, 195 U.S. 138, 143 (1904) (finding jury trial provision inapplicable in the Philippines, which was then a United States territory).

More recently, the detention of enemy combatants at the United States Naval Station at Guantanamo Bay, Cuba, has renewed the debate about the reach of constitutional protections available to nonresident aliens outside the United States. See, e.g., Boumediene, 128 S. Ct. 2229; Rasul v. Bush, 542 U.S. 466 (2004); Rasul v. Myers, 512 F.3d 644 (D.C. Cir. 2008). The extension of the habeas privilege the Supreme

Court held applicable to the Guantanamo detainees was predicated upon a finding that the United States exercised "functional" and "practical" sovereignty over the naval base, if not de jure sovereignty. See Boumediene, 128 S. Ct. at 2251-62.

In earlier precedents that provide guidance to the issues at hand, citizenship proved decisive in two seminal cases addressing the extraterritorial reach of constitutional protections. In Johnson v. Eisentrager, 339 U.S. 763, 776-78 (1950), the Supreme Court found that the federal courts' habeas corpus jurisdiction did not extend to aliens imprisoned by the United States on a German military base after World War II and who claimed their convictions for war crimes violated the Fifth Amendment and other constitutional provisions. The Eisentrager Court declared there was no authority for the proposition that "the Fifth Amendment confers rights upon all persons, whatever their nationality, wherever they are located". Id. at 783. In contrast, Reid v. Covert, 354 U.S. 1, 5-6 (1957), determined that a congressional scheme under which the wives of American servicemen stationed in Germany were subject to trial by military tribunals without the protections of the Fifth and Sixth Amendments was

unconstitutional.[2]

Given this backdrop, any claims by nonresident aliens located in a foreign sovereign state for the protection of the United States Constitution are even weaker than those of claimants under some degree of sovereign or quasi-sovereign control by the United States. See, e.g., Verdugo-Urquidez, 494 U.S. at 268-69 (holding that Fourth Amendment did not apply to the search of an alien's Mexican residence); Kleindiesnt v. Mandel, 408 U.S. 753, 762 (1972) (finding that unadmitted and nonresident aliens have no constitutional right of entry to the United States); see also Jifry v. FAA, 370 F.3d 1174, 1182 (D.C. Cir. 2004) (holding that nonresident Saudi pilots who had Federal Aviation Administration licenses revoked for security reasons had no right to Fifth Amendment protections); People's Mojahedin Org. of Iran v. U.S. Dep't of State, 182 F.3d 17, 22 (D.C. Cir. 1999) (stating that "[a] foreign entity without property or presence in this country has no constitutional rights, due process or otherwise"); Cuban Am. Bar Ass'n v. Christopher, 43 F.3d 1412, 1428 (11th Cir. 1995) (holding that Cuban and Haitian refugees seeking admission at Guantanamo Bay did not have First and Fifth Amendment rights).

---

[2] While the Reid plurality opinion would have extended the full range of constitutional protections to all American citizens being prosecuted by American tribunals abroad, the concurrence declined to do so. See 354 U.S. at 1, 77 (Harlan, J., concurring in result).

The preceding analysis demonstrates that while the precise contours of the constitutional rights afforded nonresident aliens under some degree of control or custody by the United States still remains a timely and intensely contested issue of constitutional law, the starting points and first principles in this debate are not seriously in dispute. The two available toeholds to persons who assert constitutional rights from outside the sovereign territory of the United States are American citizenship and some element of de facto or de jure American sovereignty over the territory of the events in question. See Boumediene, 128 S. Ct. at 2251-62; Verdugo-Urquidez, 494 U.S. at 274-75; Reid v. Covert, 354 U.S. at 5-6. Aliens receive constitutional protections only "when they have come within the territory of the United States and developed substantial connections with this country." Verdugo-Urquidez, 494 U.S. at 271.

Veiga, a citizen of Portugal and Italy who proffers no evidence of any connection to the United States, here asserts rights and protections under the United States Constitution in the context of her employment in Switzerland by an international organization headquartered in Switzerland, where all material events occurred in Switzerland and are subject to pertinent Swiss laws and international agreements. Veiga is plainly not entitled to the protections of the constitutional

-14-

provisions she invokes. She states no claim of American citizenship; she offers no evidence of any relevant contact by her or Defendants with the United States at any time during the course of Veiga's employment and alleged wrongful conduct at issue. Accordingly, the Court finds that the constitutional protections Veiga seeks are unavailable to her.

B. VEIGA'S LACK OF STANDING

As Veiga is not entitled to the constitutional protections she invokes, her claims also raise serious questions of standing. The determination of standing is an issue of subject matter jurisdiction, and a court lacks the authority to rule on a case unless it is has determined that such jurisdiction exists. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998). "The doctrine of standing, which addresses the question of whether the plaintiff is entitled to have the courts decide the merits of the dispute or of particular issues, embraces both 'constitutional' and 'prudential' requirements." Center for Reprod. Law and Policy v. Bush, 304 F.3d 183, 195-96 (2nd Cir. 2002) (quoting Sullivan v. Syracuse Hous. Auth., 962 F.3d 1101, 1106 (2d Cir. 1992)).

The jurisdiction of the federal courts under Article III of the Constitution extends only to "cases" or "controversies." The "irreducible constitutional minimum" of

standing contains three elements: (1) the plaintiff must have suffered an "injury-in-fact," meaning an invasion of a legally protected interest which is concrete and particularized, as well as actual and imminent; (2) there must be a "causal connection" between the injury and the challenged conduct; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable ruling. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-561 (1992).

Beyond the Article III requirements, the federal courts use the discretionary doctrine of prudential standing as a means of judicial self-restraint to avoid passing on the constitutionality of an act of the representative branches of government "unless obliged to do so in the proper performance of [the] judicial function, when the question is raised by a party whose interests entitle him to raise it." Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 474-75 (1982); see also Center for Reprod. Law, 304 F.3d at 195-96. Under the doctrine of prudential standing, courts satisfied with the existence of the Article III requirements should inquire into whether a plaintiff's claim: (1) rests on the rights of a third party; (2) asserts a "generalized grievance" better suited to a representative branch of government; or (3) asserts a claim that falls outside the "zone of interests" protected by the

law invoked. <u>Valley Forge</u>, 454 U.S. at 474-75.

Of particular concern in the case before the Court is the "zone of interests" requirement. Under this standard, where the plaintiff's complaint does not "fall within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question," the plaintiff does not have prudential standing in the federal courts. <u>Valley Forge</u>, 454 U.S. at 475 (internal quotation marks omitted). Prudential standing can serve as a jurisdictional bar to nonresident aliens alleging constitutional violations. <u>See</u> <u>DKT Memorial Fund v. Agency for Int'l Dev.</u>, 887 F.2d 275, 283-85 (D.C. Cir. 1989) (finding under a "zone of interests" analysis that foreign non-governmental organizations did not have standing to challenge the United States policy of denying development funds to organizations that advocate or support voluntary abortion under a theory that being declared ineligible for funding violated the organizations' First Amendment rights). Furthermore, while the <u>Eisentrager</u> Court did not phrase its holding in terms of standing, its analysis of the extent of the exterritorial reach of the habeas privilege was grounded in standing. <u>See</u> 339 U.S. at 776-77 (stating that "[t]he standing of the enemy alien to maintain any action in the courts of the United States has often been challenged" and "[t]he foregoing demonstrates how much further

we must go if we are to invest these enemy aliens, resident, captured, and imprisoned abroad, with standing to demand access to our courts").

The Court has previously concluded that the constitutional protections Veiga invokes do not extend to foreign nationals situated outside the borders, jurisdiction, and control of the United States. As Veiga's constitutional claims do not "fall within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question", the Court finds that her invocation of constitutional rights comprise exactly the types of claims the doctrine of prudential standing was intended to foreclose. Valley Forge, 454 U.S. at 475 (internal quotation marks omitted). As Veiga does not have standing to challenge the constitutionality of the IOIA, the Court lacks subject matter jurisdiction to consider her claims, and must dismiss the case. "Without jurisdiction the court cannot proceed in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." Ex parte McCardle, 74 U.S. 506, 514 (1869).

### III. ORDER

For the reasons stated above, it is hereby

**ORDERED** that the motion (Docket No. 20) of defendant

World Meteorological Organization to dismiss the complaint of Plaintiff Maria Do Rosário Veiga for lack of subject matter jurisdiction is GRANTED.

The Clerk of Court is directed to withdraw any pending motions and to close this case.

**SO ORDERED.**

DATED:   NEW YORK, NEW YORK
         15 July 2008

_____
Victor Marrero
    U.S.D.J.